2022 IL App (1st) 191804-U

No. 1-19-1804

Order filed June 9, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff and Counterdefendant-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CH 10596 |
| | ) | |
| DYNACOM MANAGEMENT, INC., NAVIGATORS | ) | |
| SPECIALTY INSURANCE COMPANY, as Assignee of | ) | |
| Dynacom Consulting, Services, Inc., KINGERY STEEL | ) | |
| FABICATORS, INC., and JEFF THULIN, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Navigators Specialty Insurance Company, as Assignee of | ) | |
| Dynacom Consulting Services, Inc., Defendant-Appellee, | ) | |
| Kingery Steel Fabricators, Inc., Defendant and | ) | Honorable |
| Counterplaintiff-Appellee and Cross-Appellant, and | ) | Raymond W. Mitchell, |
| Schmidt Steel, Inc., Counterdefendant-Cross-Appellee). | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Where the insurer sought a declaration that it did not owe a duty to defend or indemnify the construction site general contractor and steel fabricator for an underlying bodily injury lawsuit, the appellate court affirms the trial court's judgment, which held that (1) the evidence established that the insured had agreed to the written terms that required the insured to add the general contractor and steel fabricator as additional insureds to the insurance policy, and (2) the terms of the additional insured provision of the policy required merely a written agreement, not an executed contract, to add a third party as an additional insured.

¶ 2     When a steel worker injured at a construction site sued the general contractor and steel fabricator for negligence, the general contractor and steel fabricator then tendered the defense and indemnification of the lawsuit to the insurer of the subcontractor steel erector. However, the insurer rejected the tender and sought a declaration that it had no duty to defend or indemnify the general contractor and steel fabricator because the subcontractor steel erector had not agreed to any of the terms of the unsigned written subcontract.

¶ 3     The steel fabricator counterclaimed against the insurer for a declaration of coverage and breach of the policy. The steel fabricator also asserted an alternative count against the subcontractor steel erector for breach of an oral contract to add the general contractor and steel fabricator as additional insureds to the subcontractor's liability policy.

¶ 4     The circuit court concluded that (1) the evidence established that the subcontractor steel erector had agreed to the terms of the unsigned written subcontract that required it to add the general contractor and steel fabricator as additional insureds to the subcontractor's liability policy, and (2) the subcontractor's assent to the terms of the unsigned written subcontract entitled the general contractor and steel fabricator to status as additional insureds under the policy because the insurance terms of the parties' agreement were in writing.

¶ 5　　On appeal, the insurer argues that the circuit court's factual finding that the subcontractor steel erector agreed to the terms, other than price, of the steel fabricator's unsigned written subcontract was against the manifest weight of the evidence. The insurer also argues that the circuit court erroneously determined that the general contractor and steel fabricator were entitled to additional insured status under the subcontractor's liability policy.

¶ 6　　The steel fabricator cross-appeals, in the alternative, that if it and the general contractor are not additional insureds under the subcontractor's policy, then the circuit court erroneously dismissed as moot the steel fabricator's claim against the subcontractor for breach of an oral contract.

¶ 7　　For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 8　　　　　　　　　　　　　　I. BACKGROUND

¶ 9　　This case involves a dispute over insurance coverage for an underlying lawsuit brought by a steel worker who was injured at a construction site. Specifically, Westfield Insurance Company (Westfield) sought a declaratory judgment that it had no duty to defend or indemnify Dynacom Consulting Services, Inc. (Dynacom Consulting) and Kingery Steel Fabricators, Inc. (Kingery). Specifically, Westfield argued that its insured, Schmidt Steel, Inc. (Schmidt Steel), had not agreed to any of the terms of Kingery's unsigned written subcontract form.

¶ 10　　Dynacom Management, Inc. (Dynacom Management) was an owner of the construction site project in Naperville, Illinois, and Dynacom Consulting was the project's general contractor.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

　　Although this case was fully briefed in December 2020 and this court had ruled in January 2021 that a motion to strike cross-appellant's reply brief would be taken with the case, this case was not designated as ready for disposition until April 2022.

In early 2013, Schmidt Steel submitted a subcontract bid to Kingery to perform the steel erection work for $112,000. Kingery used Schmidt Steel's bid to calculate Kingery's own bid for the steel fabrication and erection work at the project. Dynacom Consulting then awarded Kingery the contract as memorialized in their September 2013 contract for structural steel fabrication and erection work at the project. That contract required Kingery to make its subcontractors add Dynacom Consulting as an additional insured to the subcontractors' liability policies. Schmidt Steel began work on the construction project on January 3, 2014.

¶ 11    Kingery has subcontracted steel erection work to Schmidt Steel on at least 80 occasions. On prior projects, Schmidt Steel agreed to abide by the terms of Kingery's standard form subcontract, which required Schmidt Steel to include Kingery and the respective project's general contractor as additional insureds under Schmidt Steel's commercial general liability (CGL) policy. Schmidt Steel was the named insured of a CGL insurance policy issued by Westfield. This policy contained a blanket additional insured provision, which provided additional insured coverage for qualifying third-party claims. The policy provision defined an additional insured as "all persons or organizations when [Schmidt Steel has] agreed in writing in a contract or agreement that such persons or organization be added as an additional insured."

¶ 12    On January 13, 2014, Kingery emailed Schmidt Steel a written subcontract for $102,000 on Kingery's standard form subcontract. The contract price was based on Schmidt Steel's $112,000 bid minus a $10,000 discount. The written subcontract contained a requirement that Schmidt Steel add Kingery and Dynacom Consulting as additional insureds to Schmidt Steel's CGL policy and was accompanied by a request for a certificate of insurance that identified Kingery and Dynacom Consulting as additional insureds at the project.

¶ 13    At some point, Schmidt Steel's owner, Max Schmidt, realized that he had significantly underbid the work and informed Kingery's president, David Ash, that the price term contained in Schmidt Steel's initial bid was unacceptable. They ultimately agreed that, instead of a fixed price covering Schmidt Steel's work, the work would be performed on a time and materials basis (*i.e.*, billing Kingery for labor on an hourly basis and the cost of materials). Their testimony, however, differed regarding the timing and other content of their conversation.

¶ 14    According to Ash's deposition and trial testimony, *after* Kingery sent Schmidt Steel the subcontract for $102,000 on January 13, 2014, Max called and advised Ash that Max had misread the project drawings and erroneously bid on a two-story instead of a four-story building. Based on their history, Ash agreed to accommodate Schmidt Steel by paying it on a time and materials basis. Ash did not believe that this accommodation changed any other terms of the parties' deal. Ash also testified that Kingery and Schmidt Steel, over the course of their dealings, also had entered into a handful of agreements without a written signed contract. In those cases, Schmidt Steel still agreed to provide Kingery with additional insured coverage as evidenced by Schmidt Steel's provision to Kingery of certificates of insurance in those matters. Ash testified that, according to his general practice, he obtained evidence of insurance coverage, *e.g.*, a certificate of insurance, before permitting a subcontractor to engage in major work at a project site, which in this case was scheduled to begin January 14, 2014, when the structural steel arrived at the worksite. Thereafter, Schmidt Steel (1) erected the structural steel at the site according to the drawings identified in section 1 of the unsigned written subcontract, (2) enforced an OSHA-compliant safety policy as required by section 6.1 of the unsigned written subcontract, and (3) requested all work changes be in writing as required by section 4 of the unsigned written subcontract. Schmidt Steel began

invoicing Kingery for Schmidt Steel's time and materials on February 28, 2014. Although Schmidt Steel's invoices totaled $226,298.14, it agreed to accept $200,638.14.

¶ 15    According to Max Schmidt's trial testimony, he and Ash reached an agreement regarding pricing before January 3, 2014, *i.e.*, *before* Kingery sent Schmidt Steel the subcontract for $102,000. Max testified that he had walked the jobsite with Ash and discussed the project before work began on January 3, 2014. That evening, Max reviewed his bid price, realized that he had bid on a two-story instead of a four-story building, and then called Ash to tell him Schmidt Steel could not perform the work for the bid price. However, according to Max's deposition testimony, he did not recall a conversation with Ash at the jobsite about price. Rather, Max recalled a single telephone conversation with Ash about price but did not recall when that conversation occurred.

¶ 16    The unsigned form subcontract Kingery emailed to Schmidt Steel on January 13, 2014, contained the following provision requiring Schmidt Steel to obtain insurance on behalf of Kingery and Dynacom Consulting:

> "6.2 <u>INSURANCE</u> - The Sub-contractor shall maintain during the progress of the Work, and if required to return during the warranty period: Insurance written by insurance companies acceptable to the General Contractor with the minimum limits and coverage[s] as shown below or, if higher, the requirements set forth in the Contract Documents.
>
>    \*\*\*
>
> (B) COMPREHENSIVE GENERAL LIABILITY Insurance on an occurrence basis providing limits for bodily injury and property damage including its own employees of $2,000,000 general aggregate, $2,000,000 for occurrence and $2,000,000 product and completed operations aggregate. *The policy must include*

*the General Contractor, [Kingery],* the Owner, the Architect, and others if required in the Contract Documents *as ADDITIONAL INSURED, on ISO Additional Insured Endorsement* (C020-10 11/85 edition or its equivalent), and must provide Premises-Operations, Independent Contractors, Contractual Liability, Product & Completed Operations coverage[s] which shall be maintained in force for a period of two years after substantial completion of the project or for such longer period of time as is described in the Contract Documents. XCU Exclusions must be deleted when applicable to operations performed by the Sub-contractor; Subcontractor's insurance will be primary/non-contributory to any insurance carried by any of the additional insured. In addition, Sub-contractor shall maintain an umbrella policy providing the same coverage[s] and with the same ADDITIONAL INSURED as the basic policy with a minimum amount of $5,000,000." (Emphasis added.)

The subcontract contained signature blocks but was never signed by either Kingery or Schmidt Steel. Schmidt Steel forwarded the writing to its insurance broker, Assurance Agency, Ltd., which provided a certificate of insurance to Kingery that included Kingery and Dynacom Consulting as additional insureds under Schmidt Steel's CGL policy.

¶ 17    The Assurance Agency Ltd. broker testified in her evidence deposition that Schmidt Steel sent Kingery's written subcontract and request for a certificate of insurance to her for review. Based on her experience, she understood that Schmidt Steel was seeking a certificate of insurance that complied with the forwarded subcontract's requirements. Her general practice was to review the insurance requirements of the written subcontract, including the additional insured requirements, to ensure that Schmidt Steel had proper coverage in place. If the coverage was in

place, she would issue a certificate of insurance—as she did here—identifying the relevant parties as additional insureds at the project "per written contract." If Schmidt Steel did not have the proper coverage in place, she would have alerted Schmidt Steel and given it the opportunity to purchase such coverage.

¶ 18 Schmidt Steel's employee, Jeff Thulin, was working at the construction site on April 11, 2014, when he slipped, fell and sustained injuries while installing bridging between bar joists.

¶ 19 It is undisputed that Kingery and Schmidt Steel never signed the written subcontract. However, on May 5, 2014, Kingery's office clerk emailed Schmidt Steel and requested a copy of the signed written subcontract and certificate of insurance. On January 14, 2015, Thulin sued Kingery for negligence based on his April 2014 injury. On January 22, 2015, Kingery's office clerk again emailed Schmidt Steel and requested a copy of the signed written subcontract and certificate of insurance.

¶ 20 Catie Schmidt, who is Max's wife and Schmidt Steel's office manager, testified at trial that Max told her the contract had been "changed" to a time and materials deal, and therefore Max would not sign the written subcontract, which listed a fixed price term of $102,000. Max put a note dated January 30, 2015, on the unsigned subcontract form, stating: "Max said not to send since this is a T&M job." Accordingly, Catie did not provide a signed copy of the subcontract to Kingery. Ash testified that he was not aware of his office clerk's requests to Schmidt Steel for copies of a signed subcontract. Ash thought his clerk was merely attempting to ensure that her office records were in order.

¶ 21 In February 2015, Thulin's amended complaint against Dynacom Management, Dynacom Consulting and Kingery sought relief based on theories of construction negligence, premises

liability and direct negligence. Kingery tendered its defense and indemnification of Thulin's action to Westfield and included a copy of the unsigned written subcontract.

¶ 22    Dynacom Consulting tendered its defense and indemnification of Thulin's lawsuit to Kingery and Kingery's insurer, Navigators Specialty Insurance Company (Navigators), which accepted Dynacom Consulting's tender under a reservation of rights. Dynacom Consulting also tendered its defense and indemnification to Schmidt Steel and Westfield. Dynacom Management, which did not sign a contract with Kingery, did not tender its defense and indemnification to Kingery and Navigators. Later, Navigators was substituted for Dynacom Consulting in April 2019 following an assignment of rights.

¶ 23    Meanwhile, Westfield disclaimed any obligation to defend Kingery and Dynacom Consulting based on the failure of Schmidt Steel and Kingery to sign the written subcontract form.

¶ 24    In July 2015, plaintiff Westfield filed a complaint for declaratory relief against defendants Dynacom Management, Dynacom Consulting, Kingery and Thulin, seeking a declaration that it did not owe a duty to defend or indemnify Dynacom Management, Dynacom Consulting or Kingery against Thulin's underlying bodily injury lawsuit. Westfield alleged that Dynacom Management, Dynacom Consulting and Kingery did not qualify as additional insureds on the Westfield policy because Westfield's insured, Schmidt Steel, performed at the project under an oral contract and did not agree in a written contract to name Dynacom Management, Dynacom Consulting and Kingery as additional insureds with respect to the work at issue.

¶ 25    Kingery filed an answer to Westfield's complaint for declaratory relief and raised the affirmative defenses of the parties' written contract and the failure to join Schmidt Steel as a necessary party. Kingery also filed a counterclaim against Westfield for a declaration of coverage

and breach of the policy. In the alternative, Kingery filed a counterclaim against Schmidt Steel for breach of an oral contract to add Kingery and Dynacom Consulting as additional insureds to its CGL policy for work at the project.

¶ 26    In June 2018, Westfield and Schmidt Steel moved for summary judgment against Dynacom Management, Dynacom Consulting and Kingery, arguing that Westfield's policy limited additional insured status to those parties Schmidt Steel agreed to add by a written contract and Schmidt Steel never had a written contract adding the Dynacom entities and Kingery as additional insureds.

¶ 27    In its response, Kingery argued that summary judgment was improper because either (1) Kingery and Dynacom Consulting qualified as additional insureds under the CGL policy Westfield issued to Schmidt Steel, or (2) Schmidt Steel breached its contract with Kingery to add Kingery and Dynacom Consulting as additional insureds to Schmidt Steel's CGL policy for liabilities arising out of its work at the construction project. Kingery argued that Westfield's policy merely required an agreement "in writing," not a signed written contract, and the written subcontract between Kingery and Schmidt Steel was unsigned because its price term had been changed to accommodate Schmidt Steel's bidding error. Nevertheless, substantial evidence showed that Schmidt Steel agreed to the remaining subcontract terms through its acts and conduct and this agreement was in effect when Thulin was injured. These agreed-upon terms included the requirement that Schmidt Steel add Kingery and Dynacom Consulting as additional insureds to Schmidt Steel's Westfield liability policy for work at the project. In the alternative, Kingery argued that Schmidt Steel breached its agreement to provide Kingery and Dynacom Consulting with additional insured coverage.

¶ 28    On October 11, 2018, the circuit court denied Westfield and Schmidt Steel's motion for summary judgment. Specifically, the court concluded that the additional insured provision of Schmidt Steel's Westfield policy did not require a formally executed written contract between Kingery and Schmidt Steel to effectuate the additional insured provision. The court also concluded that a genuine issue of material fact existed about whether the unsigned writing at issue represented an agreement between Schmidt Steel and Kingery for Schmidt Steel to provide additional insured coverage to Kingery and Dynacom Consulting.

¶ 29    The circuit court held a bench trial in April 2019 to resolve whether Schmidt Steel had agreed to the terms of the unsigned written subcontract. Based on the evidence presented at the trial, the court concluded in a written interim order dated June 6, 2019, that, excepting price, Schmidt Steel had agreed to the terms of the unsigned written subcontract, including the term that required it to add Kingery and Dynacom Consulting as additional insureds to its liability policy. The court also found that Schmidt Steel's assent to the terms of the unsigned written subcontract entitled Kingery and Dynacom Consulting to status as additional insureds under the policy, which the court construed in favor of coverage. Specifically, the court ruled that the policy's language did not unambiguously require a formally executed written contract, but only written evidence of an agreement to provide insurance. The court concluded that Kingery and Dynacom Consulting qualified as additional insureds under the policy because the insurance terms of the parties' agreement were in writing.

¶ 30    Accordingly, the court (1) entered judgment in favor of the Dynacom entities and Kingery and against Westfield on Westfield's complaint for declaratory relief, (2) entered judgment in favor of Kingery and against Westfield on Kingery's counterclaim for a declaration of coverage,

(3) reserved ruling on Kingery's counterclaim against Westfield for breach of contract until the completion of the evidentiary hearing on damages, and (4) dismissed as moot Kingery's counterclaim against Schmidt Steel for breach of an oral contract. The court declared that Westfield owed a duty to defend and indemnify Kingery, Dynacom Management, and Dynacom Consulting against the underlying complaint filed by Thulin.

¶ 31　The parties entered a joint agreed stipulation that all claims and counterclaims brought by and against Dynacom Management were resolved, waived and released; moved to vacate the court's June 6, 2019 order to the extent that it entered any relief in favor of Dynacom Management; and moved to dismiss any claims and counterclaims brought by and against Dynacom Management, with prejudice.

¶ 32　On August 7, 2019, the court issued a written final judgment order that, on the motion of Dynacom Management, vacated the June 6, 2019 order insofar as any relief entered in favor of Dynacom Management. But in all other respects, the court incorporated and adopted all of its prior rulings. In addition, the court entered judgment in favor of Kingery and against Westfield on Kingery's counterclaim for breach of contract in the amount of $350,000. The court stayed enforcement of the judgment pending appeal.

¶ 33　Westfield appealed the circuit court's determination that Kingery and Dynacom Consulting qualified as additional insureds under Schmidt Steel's CGL policy. Kingery, while maintaining that there was no basis to reverse the circuit court's judgment, in the alternative cross-appealed the circuit court's dismissal as moot of Kingery's breach of oral contract claim against Schmidt Steel.

¶ 34                                    II. ANALYSIS

¶ 35                     A. Motion to Strike Kingery's Reply Brief

¶ 36    Westfield and Schmidt Steel move to strike all but section II.B of Kingery's cross-appellant's reply brief pursuant to Illinois Supreme Court Rule 343(b)(1) (eff. July 1, 2008), for allegedly failing to confine its argument to the issue of challenging the circuit court's dismissal as moot of Kingery's counterclaim against Schmidt Steel for breach of an oral contract. Rule 343(b)(1) provides that "the cross-appellant may file a reply brief confined strictly to replying to those arguments raised on the cross-appeal." *Id*.

¶ 37    Kingery responds that its reply brief is properly directed to arguments relevant to its cross-appeal, which overlap substantially with the issues in the main appeal.

¶ 38    We conclude that portions of Kingery's reply brief are not confined to strictly replying to its cross-appeal of the dismissal of its oral contract claim against Schmidt Steel. Accordingly, the portions of Kingery's cross-appellant's reply brief that contain argument that is not confined to Kingery's cross-appeal are stricken and we will consider only the arguments in Kingery's reply brief that are confined to its cross-appeal. See *Graham v. Illinois State Toll Highway Authority*, 182 Ill. 2d 287, 293-94 (1998).

¶ 39                     B. Manifest Weight of the Evidence

¶ 40    Westfield argues the circuit court's factual findings were contrary to the manifest weight of the evidence because Schmidt Steel's performance of the steel erection according to the drawings and Kingery's routine request for a certificate of insurance from Schmidt Steel were not evidence of Schmidt Steel's assent to Kingery's draft subcontract. Westfield contends the circuit court inappropriately regarded Ash's subjective beliefs about principles of contract formation as

issues of credibility. Westfield argues that Kingery and Schmidt Steels' practice to always memorialize their written agreements with a signature strongly supports the conclusion that this subcontract was oral, not "in writing." Westfield also argues that Kingery's post-accident conduct, *i.e.*, sending its January 13, 2014 subcontract form to Schmidt Steel after Thulin's April 2014 accident and asking for copies of a signed subcontract, confirms that Kingery and Schmidt Steel never agreed in writing to procure additional insured coverage.

¶ 41 The issues of the existence and terms of a contract present questions of fact. *Trapani Construction Co., Inc. v. Elliot Group, Inc.*, 2016 IL App (1st) 143734, ¶ 35. This court gives great deference to the trial court's factual findings made after a hearing with live witness testimony and will reverse the trial court's ruling based on those findings only if it is against the manifest weight of the evidence. *Apollo Heating & Air Conditioning Corp. v. American National Bank & Trust Co.*, 135 Ill. App. 3d 976, 978-79 (1985). The trial court's fact determinations are against the manifest weight of the evidence only "when an opposite conclusion is apparent or when the judgement appears to be unreasonable, arbitrary, or not based on evidence." *Trapani Construction Co., Inc.*, 2016 IL App (1st) 143734, ¶ 37.

¶ 42 A party may assent to an agreement's terms, not only by its words, but also by its conduct. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313-14 (1987); Restatement (Second) of Contracts § 19 (1981) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."). "It is well settled that a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it. [Citations.] For course of conduct to act as consent to a contract, it must be clear that the conduct relates to the specific contract in question.

[Citation.]" *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383 (1988).

¶ 43    The trial court's finding that Schmidt Steel agreed to the terms of the unsigned subcontract, with the exception of the price, was not against the manifest weight of the evidence. Ash testified, based on his interactions with Schmidt Steel and observations of its work at the project, that the parties understood that the work was to be performed according to the terms of the written subcontract other than price. The trial court found Ash's testimony credible because it was supported by documentary evidence including evidence of the parties' course of dealing, Schmidt Steel's failure to object to any term other than price, and Schmidt Steel's performance of the terms of the written subcontract. The trial court was within its rights to find that Max Schmidt's testimony lacked credibility and reject it. *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 107 ("reviewing court will not disturb the trial court's determination of credibility because the trial court has a superior vantage point, which cannot be reproduced from the cold record, to observe and judge the witnesses' demeanor and credibility").

¶ 44    The evidence at trial established that Schmidt Steel signed Kingery's standard subcontract form on at least 85 other projects, so Max Schmidt was familiar with the form's terms and knew that he was expected to comply with them. Schmidt Steel's agreement to operate according to the same terms in all the other instances was evidence that Max agreed to the same terms in this case. See *Gaslite Illinois, Inc. v. Northern Illinois Gas Co.*, 46 Ill. App. 3d 917, 922-24 (1977) (prior dealings were evidence of contract's terms).

¶ 45    Furthermore, Max did not object to any term in the written subcontract other than the price. Both Max and Ash testified that the only dispute Max raised about the written subcontract was the

$102,000 price, and that dispute was resolved when they agreed that Kingery would pay Schmidt Steel on a time and materials basis. Schmidt Steel's failure to object to any term other than price is evidence of assent to the remaining terms. See *Landmark Properties, Inc.*, 172 Ill. App. 3d at 383-84 (plaintiff's failure to object to written agreement was evidence of assent to same); see also *Construction Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505, 510 (7th Cir. 1968) (plaintiff's request for a change to the payment terms of the defendant's offer, without objection to the offer's other terms, constituted a counteroffer that included the remaining terms).

¶ 46    The evidence also established that Schmidt Steel performed the tasks required of it by the written subcontract, including the scope of the work to unload and erect the steel, obtaining work change orders in writing, implementing OSHA-compliant safety procedures at the site, and maintaining $500,000 in workers' compensation insurance and $7 million combined in CGL and umbrella insurance. Schmidt Steel also complied with the subcontract requirement to add Kingery and Dynacom Consulting as additional insureds to its liability policy and give Kingery a certificate of insurance before starting major work at the project. Schmidt Steel's performance of the obligations listed in the written subcontract, particularly Schmidt Steel's provision of a certificate of insurance that identified Kingery and Dynacom Consulting as additional insureds for the project at issue, is evidence that Schmidt Steel assented to the other written terms on the unsigned subcontract except for the price. *West Bend Mutual Insurance Co. v DJW-Ridgeway Building Consultants, Inc.*, 2015 IL App (2d) 140441, ¶¶ 25-26, 30 (provision of a certificate of insurance was evidence that the named insured assented to the terms of the unsigned written contract that required the insured to name the defendant as an additional insured).

¶ 47    Westfield cites *West Bend Mutual Insurance Co. v. Athens Construction Co.*, 2015 IL App (1st) 140006 (2015), to support its argument that a certificate of insurance does not serve as evidence of an insured's intent to name a party as an additional insured. Westfield's reliance on *Athens Construction Co.* is misplaced. In *Athens*, the issue was not whether the named insured had assented to the terms of a written contract, but whether the actual, plain language of the parties' written contract required the named insured to add defendant Athens as an additional insured to its policy. *Id.* at ¶ 28. Here, there is no dispute that the unsigned written subcontract unambiguously required Schmidt Steel to add Kingery and Dynacom Consulting as additional insureds to its policy.

¶ 48    Similarly misplaced is Westfield's reliance on *United Stationers Supply Co. v. Zurich American Insurance Co.*, 386 Ill. App. 3d 88, 92 (2008), where the court determined that there was no written contract that required the named insured to add United Stationers Supply Company to the insured's policy. The court also held that a certificate of insurance, without more, did not trump the insurance policy's language and confer coverage. *Id.* at 104. Here, Kingery and Dynacom Consulting do not contend that the certificate of insurance entitled them to coverage. Rather, they contend that the written agreement, which was absent in *United Stationers Supply Co.*, entitled them to coverage and the certificate is evidence that Schmidt Steel assented to the written agreement.

¶ 49    Finally, Westfield argues that Kingery's post-accident conduct confirms that Kingery and Schmidt Steel never agreed in writing to procure additional insured coverage. Specifically, Westfield contends that when Kingery sent its January 13, 2014 subcontract form to Schmidt Steel after Thulin's April 2014 accident and asked for copies of a signed subcontract, Kingery confirmed

that it and Schmidt Steel never agreed in writing to procure additional insured coverage. We disagree. "[A] judgment is not against the manifest weight of the evidence merely because there is sufficient evidence to support a contrary conclusion." *Apollo Heating & Air Conditioning Corp.*, 135 Ill. App. 3d at 978-79. Furthermore, Ash testified that, unknown to him, his office clerk had contacted Catie Schmidt to obtain signed copies of the subcontract, and Ash thought his clerk was simply trying to ensure that her office records were in order.

¶ 50    We conclude that the trial court's determination that Schmidt Steel assented to the terms of the unsigned written subcontract, except for the price term, was not against the manifest weight of the evidence.

¶ 51                               C. Agreement in Writing

¶ 52    Based on its factual finding that Schmidt Steel assented to the terms of the written subcontract other than price, the trial court concluded based on the language of Schmidt Steel's CGL policy that Kingery and Dynacom Consulting qualified as additional insureds.

¶ 53    On appeal, Westfield urges this court to correct the clear legal error of the trial court and reverse. Westfield argues that an agreement in writing was an indispensable condition to additional insured coverage under the Westfield policy language and Kingery failed to prove that it had anything more than an oral agreement with Schmidt Steel to add Kingery and Dynacom Consulting as additional insureds on Schmidt Steel's CGL policy before Thulin's accident. According to Westfield, even though Kingery's unsigned form subcontract was written, it was merely an attachment to a clerical request for a certificate of insurance and did not constitute a contract or agreement between Kingery and Schmidt Steel.

¶ 54    We review *de novo* the trial court's ruling that Schmidt Steel's assent to the terms of the written subcontract other than price entitled Kingery and Dynacom to additional insured status under Schmidt Steel's CGL policy. The interpretation of the provisions of an insurance policy presents a question of law and is subject to *de novo* review. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001); see also *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 19 (under *de novo* review, the reviewing court performs the same analysis a trial judge would perform and gives no deference to the judge's conclusions or specific rationale).

> "In construing the language of the policy, the court's primary objective is to ascertain and give effect to the intent of the parties to the contract. [Citations.] In order to ascertain the meaning of the policy's language and the parties' intent, the court must construe the policy as a whole and 'take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.' [Citations.] If the words of a policy are clear and unambiguous, 'a court must afford them their *plain, ordinary, and popular meaning*.' (Emphasis in original.) [Citation.] Conversely, if the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured. [Citations.] However, this court 'will not strain to find ambiguity in an insurance policy where none exists.' [Citations.]" *Travelers Insurance Co.*, 197 Ill. 2d at 292-93.

¶ 55    The plain language of the policy requires only that Schmidt Steel's agreement to provide additional insured coverage be in writing. Schmidt Steel's CGL policy confers additional insured status on persons or organizations when Schmidt Steel "*agrees in writing in* a contract or *agreement* that such person or organizations be added as additional insureds." (Emphasis added.)

The plain meaning of this provision requires only that Schmidt Steel's agreement to provide additional insured coverage be in writing. It does not require that all the terms of the parties' agreement be in writing, nor does it require that those terms be encompassed in a formally executed written contract. If Westfield had wanted to require its insured to enter into a written contract, Westfield could have simply said so.

¶ 56 We conclude that Kingery and Schmidt Steel's agreement satisfies the requirements of Westfield's CGL policy because the policy's language can be reasonably interpreted to require only that the insurance portion of the parties' agreement be in writing, as opposed to the entire agreement. Even if Westfield's interpretation, *i.e.*, that the policy's language required an executed written contract of the parties' entire agreement, were also reasonable, then the policy language would be deemed ambiguous and Illinois law requires that an ambiguity must be construed in favor of coverage. See *Pekin Insurance Co. v. Miller*, 367 Ill. App. 3d 263, 270-72 (2006).

¶ 57 Westfield also argues that Kingery failed to prove the allegation raised in its amended counterclaim (*i.e.*, the chronological fact that Max Schmidt telephoned Ash about the bidding error *after* Max reviewed the January 13, 2014 subcontract form and then they reached a time and materials agreement), and therefore is not entitled to judgment on the basis articulated by the trial court because it was never pled. Specifically, Westfield claims that Kingery pled the theory of incorporation of a document at the time of contract formation, but the trial court ruled in favor of Kingery based on the distinct theory of modification of an existing contract. Westfield urges this court to reverse the trial court because Kingery pled that its January 13, 2014 subcontract form was incorporated into the parties' contract at the time of formation, but Kingery failed to introduce any evidence that the subcontract form was even in existence at the time of formation.

¶ 58    Westfield argues that, even setting aside Kingery's failure to plead modification, Kingery failed to prove that the parties' oral time-and-materials agreement was modified by the subsequent email from Kingery to Catie Schmidt on January 13, 2014, attaching a draft subcontract for $102,000, because there was no fresh consideration for the modification and Schmidt never accepted the proposed modification. Westfield asserts that even if negotiations were still open as of January 13, 2014, the terms of Kingery's standard form subcontract were not incorporated into the oral contract.

¶ 59    Westfield has forfeited review of its contract modification argument because Westfield argues for the first time on appeal that the undisputed evidence established that an oral contract was formed between Kingery and Schmidt Steel before Kingery sent the written subcontract to Schmidt Steel on January 13, 2014. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 36 (appellant failed to preserve an argument for appeal by not raising it below). Nor did Westfield argue that, because the alleged oral agreement predated Kingery's transmission of the written subcontract, the written subcontract was at most a modification to the prior oral agreement. To the contrary, Westfield asserted exactly the opposite, stating in its posttrial brief that there was "no evidence that the parties reached any kind of agreement prior to January 13, 2014, or that Kingery's counter-proposal as of that date represented or memorialized any kind of agreement at all."

¶ 60    Furthermore, Westfield's modification argument relies on its erroneous assertion that it is an undisputed fact that Ash agreed to pay Schmidt Steel on a time and materials basis *before* Kingery sent the subcontract form to Schmidt Steel on January 13, 2014. To the contrary, Ash testified that the time and materials telephone conversation happened in response to Kingery emailing the written subcontract to Schmidt Steel.

¶ 61    Next, Westfield argues that the circuit court erred in applying the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 *et seq*. (West 2020)), which applies to contracts for the sale of goods, not to contracts for services, instead of the Illinois common law mirror image rule. According to Westfield, even assuming that contract formation had not yet occurred before Kingery sent its January 13, 2014 email, Max still did not accept any of the terms of Kingery's subcontract form, but instead rejected it, in accordance with the common law mirror image rule. Westfield cites *Finnin v. Bob Lindsay, Inc.*, 366 Ill. App. 3d 546, 548 (2006), for the proposition that the mirror image rule provides that "an acceptance requiring any modification or change in terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before a valid contract is formed." Westfield asserts that Max implicitly rejected any fixed-price subcontract for $102,000 when he stated that his $112,000 bid was too low and therefore was not bound to any of the other terms in the subcontract form regardless of the fact that the parties went on to reach an agreement. Westfield argues that even if Max's only objection to the deal was price, the parties went back to the *status quo* on their telephone call under the mirror image rule and then proceeded to execute a freestanding oral contract for time and materials. Westfield asserts that, even under the UCC standard, the disparity in Kingery's and Schmidt Steel's positions was so great on the fundamental issue of price that Max's position was tantamount to a rejection, and, thus, the oral subcontract did not incorporate any of the terms of Kingery's rejected form subcontract.

¶ 62    Westfield's argument regarding the UCC misconstrues the trial court's ruling and the mirror image rule. The trial court did not apply the UCC here. Rather, the trial court determined that the mirror image rule was not applicable because it is used to determine whether a contract is

formed; once formed, the parties' conduct is the best evidence of its terms. The issue here was not whether a contract was formed but rather what terms the contract included. The trial court properly determined that the party's conduct, not the mirror image rule, was the best evidence of their contract terms. See Restatement (Second) of Contracts § 18 (1981) ("Where a bargain has been fully performed on one side, there is commonly no need to determine the moment of making of the contract or whether the performing party made a promise before he performed."). Max's objection to only the price term was effectively a conditional acceptance to perform under the written subcontract for a different price. This conditional acceptance operated as a rejection of the entire contract and as a counteroffer that included the non-objectional terms. Kingery's subsequent offer to pay on a time and materials basis was an acceptance of Max's counteroffer and/or a modified offer that Schmidt Steel subsequently accepted through performance. *Kropp Forge Co. v. Jawitz*, 37 Ill. App. 2d 475, 482-83 (1962) (declining to decide whether a party's purported acceptance conformed to the offer because the parties' conduct established that even if the purported acceptance did not conform, it was a counteroffer that was subsequently accepted, thus forming a contract).

¶ 63    We conclude based on the language of Schmidt Steel's CGL policy that Kingery and Dynacom Consulting qualified as additional insureds under the policy.

¶ 64                                    D. Kingery's Cross-Appeal

¶ 65    Based on our conclusion that Kingery and Dynacom Management qualify as additional insureds under Schmidt Steel's CGL policy, we conclude that the trial court properly dismissed as moot Kingery's cross-appeal against Schmidt Steel for breach of an oral contract that required

Schmidt Steel to add Kingery and Dynacom Consulting as additional insureds to Schmidt Steel's CGL policy.

¶ 66                                    III. CONCLUSION

¶ 67     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 68     Affirmed.