2015 IL App (2d) 140441
No. 2-14-0441
Opinion filed May 19, 2015

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| WEST BEND MUTUAL INSURANCE COMPANY, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No.13-MR-93 |
| DJW-RIDGEWAY BUILDING CONSULTANTS, INC., | ) ) ) | Honorable Christopher C. Starck, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion

**OPINION**

¶ 1   Plaintiff, West Bend Mutual Insurance Company (West Bend), appeals the grant of summary judgment in favor of defendant, DJW-Ridgeway Building Consultants, Inc. (Ridgeway), on West Bend's complaint for a declaratory judgment that it does not owe Ridgeway a duty to undertake its defense in a construction negligence suit. We affirm, agreeing that, under the undisputed material facts, West Bend owes Ridgeway a duty to defend.

¶ 2                    I. BACKGROUND

¶ 3   At the outset we note that, after the briefs were submitted in this appeal, the First District Appellate Court issued its decision in *West Bend Mutual Insurance Co. v. Athens Construction*

*Co.*, 2015 IL App (1st) 140006.  West Bend has filed a motion to cite the case as additional authority.  Ridgeway has not objected.  We grant the motion and discuss the case in our analysis below (*infra* ¶¶ 28-31).

¶ 4     In April 2008, Brian delaTorre was injured while working on the construction of a commercial building called "the Village Commons."  Lake Effect Development III, LLC (Lake Effect), was the developer on the project.  Lake Effect had hired Ridgeway as the general contractor, and Ridgeway had in turn hired Jason the Mason, Inc., as the masonry subcontractor. In 2010, delaTorre brought a negligence suit naming Lake Effect, Ridgeway, and Jason the Mason as defendants.  See *DelaTorre v. Lake Effect Development III, LLC*, 2015 IL App (2d) 140596-U (partially reversing summary judgment in favor of Ridgeway and Jason the Mason). Ridgeway tendered the defense of the action to West Bend on the theory that Ridgeway was an "additional insured" on a liability policy that Jason the Mason held with West Bend.  West Bend refused the tender and later sued for a declaratory judgment that it had no duty to defend. Ridgeway countersued for a declaratory judgment that West Bend did have a duty.   The parties subsequently filed cross-motions for summary judgment on the issue.

¶ 5     The parties submitted the following documents with their summary-judgment filings: (1) the liability policy under which Ridgeway claimed that it was an additional insured (the Policy); (2) a two-page work proposal prepared by Jason the Mason and submitted to Ridgeway (the Proposal); and (3) a three-page subcontract agreement prepared by Ridgeway and submitted to Jason the Mason (the Agreement).  Also submitted were the depositions of Jason Schwan, president of Jason the Mason, and David Wardeberg, president of Ridgeway.   From those submissions we present the following undisputed facts.

¶ 6     The Policy states in relevant part:

### "ADDITIONAL INSURED – CONTRACTOR'S BLANKET

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. **WHO IS AN INSURED (Section II)** is amended to include as an additional insured any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement.

The written contract or written agreement must be:

1. Currently in effect or becoming effective during the term of this policy; and

2. Executed prior to the 'bodily injury,' 'property damage,' 'personal injury and advertising injury.'

B. The insurance provided to the additional insured is limited as follows:

* * *

2. The Limits of Insurance applicable to the additional insured are those specified in the written contract or written agreement or in the Declarations for this policy, whichever is less. These Limits of Insurance are inclusive and not in addition to the Limits of Insurance shown in the Declarations.

* * *

C. As respects the coverage provided under this endorsement, Paragraph **4.b. SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended with the addition of the following:

**4. Other insurance**

**b**. Excess insurance

> This insurance is excess over:
>
> Any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless a written contract specifically requires that this insurance be either primary or primary and noncontributing. Where required by written contract, we will consider any other insurance maintained by the additional insured for injury or damage covered by this endorsement to be excess and noncontributing with this insurance.
>
> When this insurance is excess, as a condition of coverage, the additional insured shall be obligated to tender the defense and indemnity of every claim or suit to all other insurers that may provide coverage to the additional insured, whether on a contingent, excess or primary basis."

There is no dispute that the Policy was in effect when delaTorre was injured, in April 2008.

¶ 7 As proof of a "written contract or written agreement" executed prior to delaTorre's injury and requiring that Ridgeway be named as an additional insured under the Policy, Ridgeway pointed to the Proposal and the Agreement. The Proposal, which described masonry work to be performed at the Village Commons, was prepared and signed by Schwan and submitted to Ridgeway in late August 2007. The copy of the Proposal in the record also bears Wardeberg's signature, dated November 8, 2007. The only language in the Proposal regarding insurance is the following:

> "Owner to carry fire, tornado, wind, and other necessary insurance upon above work. Workman's Compensation and Public Liability Insurance on above work to be taken out by **Jason the Mason, Inc.**"

¶ 8    The copy of the Agreement in the record has signature lines for Wardeberg (as president of Ridgeway) and for "Sub-Contractor," but the lines are blank.  The first paragraph of the Agreement recites that it was "made this 8th day of November 2007," between Jason the Mason as "Sub-Contractor" and Ridgeway as "Contractor."  The second paragraph states that the Agreement is "supplemental to and a part of that certain signed proposal between Contractor and Sub-Contractor to which it is attached."

¶ 9    Wardeberg testified at his deposition that he received the Proposal by fax.  Initially in his testimony, Wardeberg stated that he did not recall why neither he nor anyone from Jason the Mason signed the Agreement.  Later, however, Wardeberg testified that on or about November 8, 2007, Schwan came to Ridgeway's offices and Wardeberg handed him the signed Proposal, to which Wardeberg had attached the Agreement.  Asked why he did not have Schwan sign the Agreement at that time, Wardeberg replied that Schwan "wanted to review it and was going to get it back to me."  Wardeberg noted that, if Schwan had signed the Agreement and returned it, Ridgeway would have retained the document in its files, but in fact Ridgeway had no signed copy of the document.  Asked why he believed that Schwan accepted the terms of the Agreement, Wardeberg answered, "He went and did the work."

¶ 10    In his deposition, Schwan acknowledged that Jason the Mason's project files contained copies of the Proposal (signed by him and Wardeberg) and the Agreement (signed by no one).  Schwan had no memory of receiving the Agreement from Ridgeway but also had no reason to doubt that he did receive it.  Schwan also had no recollection of the "order" in which the Proposal and the Agreement appeared in his project files.  Schwan noted that just because the Agreement was in his files did not mean that he reviewed it.

¶ 11    Paragraphs 5 and 6 of the Agreement state:

"5. INSURANCE. Prior to commencing the Work, Sub-Contractor shall secure, pay for, and file with the Contractor, Certificates of Insurance for workers' compensation insurance; general liability, auto liability and property damage insurance, having a combined single limit of liability of not less than $2,000,000 or such higher limit as reasonably required by the Contractor; and completed operations insurance, and such other insurance coverage as may be required by the Prime Contract[1] or Illinois statutory law. The Contractor is to be named as an additional insured on Sub-Contractor's insurance policy(s) with a Certificate evidencing Contractor as additional insured commencing prior to Work beginning and remaining in place until completion of the Sub-Contractor Agreement and Prime Contract. Please refer to the Attached Exhibit 'A', Insurance Requirements, which provides detail for the Sub-Contractor to give to his insurance agent to issue appropriate Certificates of Insurance.

6. INDEMNIFICATION. In consideration of $10.00 dollars and other valuable consideration, receipt of which is hereby acknowledged, and in addition to other indemnities elsewhere specifically provided herein and in the Prime Contract, the Sub-Contractor shall assume the defense of, and shall indemnify and save and hold harmless the Contractor, the Owner, any Lender to the Project, and their respective directors, officers, employees, agents, successors and assigns, from all claims, liability, loss, damage or injuries of every kind resulting from the Sub-Contractor's performance or failure to perform the Work and[/]or failure to fulfill the obligations stated herein and/or the Prime Contract."

---

[1] The Agreement defines the "Prime Contract" as the entire contractual relationship between Lake Effect and Ridgeway.

¶ 12   Exhibit A to the Agreement provides as follows:

"EXHIBIT 'A'

RIDGEWAY BUILDERS LIMITED

SUB-CONTRACTOR INSURANCE REQUIREMENTS

I. <u>WORKERS' COMPENSATION INSURANCE</u>

Coverage A:

Statutory coverage will be required within 30 days notice of cancellation.

Coverage B:

Employers Liability Coverage: $500,000 Bodily Injury

Sickness and Disease: $500,000

Policy Limit Accident and Sickness: $500,000

II. <u>COMMERCIAL GENERAL LIABILITY INSURANCE</u>

Limits of insurance will be required as follows:

Each Occurrence: $1,000,000

General Aggregate: $2,000,000

Products Liability and Complete Operations Aggregate: $2,000,000

Personal and Advertising Injury: $1,000,000

Fire Damage Liability: $50,000

Medical Expense: $5,000

30-Day Notice of Cancellation

III. <u>BUSINESS AUTOMOBILE INSURANCE</u>

Bodily Injury & Property Damage Liability: $1,000,000

Combined Single Limit of Liability

30-Day Notice of Cancellation

IV. <u>UMBRELLA LIABILITY COVERAGE</u>

Coverage to be excess of: $1,000,000

Employers' Liability

General Liability Insurance

Automobile Liability Insurance

30-Day Notice of Cancellation

V. <u>INSURANCE CERTIFICATES</u>

* Sub-Contractor will provide Ridgeway Buildings with insurance certificates confirming the insurance limits required in paragraphs I through IV above. These certificates will include a provision that the Sub-Contractor's insurance companies will provide thirty (30) days written notice to Ridgeway Builders prior to the cancellation or non-renewal of these policies; except for ten (10) days notice in the event of non-payment of insurance premiums."

¶ 13    On January 2, 2008, Ridgeway faxed to R-H Insurance Group (R-H), Jason the Mason's insurance agent, the following note:

"We need a certificate of Insurance for your client 'Jason the Mason' for both General Liability and Worker's Comp. coverage. Per our insurance agent, we are required to have the following provision on our subcontractor Certificate of Insurance: **DJW Ridgeway Building Consultants is named as Additional Insured on a Primary and Non-Contributory basis.**

Please send us a certificate with the provision. ***"

¶ 14    That same day, R-H faxed to Ridgeway a "Certificate of Insurance" that designated Jason the Mason as "insured" and Ridgeway as "certificate holder." The certificate stated: "DJW RIDGEWAY BUILDING CONSULTANTS IS NAMED AS ADDITIONAL INSURED ON A PRIMARY NON-CONTRIBUTORY BASIS." The certificate also contained the following disclaimer:

> "THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED BELOW."

The certificate proceeded to recite the various coverages provided to Jason the Mason by West Bend.

¶ 15    In its summary-judgment filings, West Bend denied on several grounds that it had a duty to defend Ridgeway in delaTorre's negligence suit. Only two of those defenses are material to this appeal. The first was that, because the Agreement was not signed by West Bend or Ridgeway, it did not constitute an "executed" written agreement as required by the Policy and therefore was ineffective in its mandate that Jason the Mason add Ridgeway as an additional insured under the Policy. The second defense was that, even if Ridgeway were an additional insured under the Policy, the coverage afforded Ridgeway was excess, not primary, and therefore West Bend still had no duty to defend.

¶ 16    In a written order, the trial court granted summary judgment for Ridgeway and denied it for West Bend. The order set forth no reasons for the judgment, nor does the record contain a transcript of the hearing on the summary-judgment motions.

¶ 17    West Bend filed this timely appeal.

¶ 18                                   II. ANALYSIS

¶ 19                        A.  General Standards of Review

¶ 20    West Bend challenges the trial court's disposition of the cross-motions for summary judgment.  "The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists."  *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004).  Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 2012).  In determining whether a genuine issue of material fact exists, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the nonmovant.  *Adams*, 211 Ill. 2d at 43. Here, though the parties' cross-motions for summary judgment were a mutual concession that there is no genuine issue of material fact, we are not bound by that concession and may find the matter unsuitable for summary judgment regardless.  *Pielet v. Pielet*, 2012 IL 112064, ¶ 28.  We review *de novo* the grant or denial of summary judgment.  *Adams*, 211 Ill. 2d at 43.

¶ 21                             B.  Additional Insured

¶ 22    The Policy accepts an additional-insured designation that is required in a "written contract or written agreement" that was "executed" prior to the injury for which coverage is claimed.  West Bend does not dispute that the Agreement by its terms requires Ridgeway to be named as an additional insured under the Policy.  West Bend's point of contention, rather, is that the Agreement was not "executed" (per the Policy), because it bore no signatures.  An insurance policy is a contract (*State Farm Fire & Casualty Co. v. Martinez*, 384 Ill. App. 3d 494, 498 (2008)), and the determination of contractual rights is a question of law, suitable for resolution in

a summary-judgment proceeding (*Certain Underwriters at Lloyd's, London v. Central Mutual Insurance Co.*, 2014 IL App (1st) 133145, ¶ 7). "Executed" is not defined in the Policy. "Where a term in an insurance policy is not defined, we afford that term its plain, ordinary and popular meaning, *i.e.*, we look to its dictionary definition." *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 436 (2010). The dictionary definition of "execute" appropriate to this context is to affix a signature. See Black's Law Dictionary 589 (7th ed. 1999) (to "execute" means "3. To make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form <each party executed the contract without a signature witness>."). There are no signatures on the Agreement. West Bend believes that this fact settles the matter, while Ridgeway proposes that the "written contact or agreement" in this case consists of the (unsigned) Agreement together with the (signed) Proposal. We agree with Ridgeway that these two documents comprise a "written contact or agreement" requiring that Ridgeway be named an additional insured under the Policy.

¶ 23   Certain undisputed facts lead us to this conclusion. First, the Agreement states that it is "supplemental to and part of that certain signed proposal between Contractor and Sub-Contractor to which it is attached." West Bend maintains that, for the Proposal and the Agreement to be considered one contract, the language of incorporation must appear in the signed writing, namely the Proposal. We disagree; the rules are not so rigid for construing two or more documents as a single contract.

> "[A] contract need not be on a single piece of paper, but the writings taken together must contain all the essential elements to show a contract between the parties so that there is no need of parol proof of any of the terms or conditions of the sale or the intention of the parties. [Citation.] It is necessary that where various writings are involved, they be

connected in some definite manner. [Citation.] The signed writing or writings must refer expressly to the other writing, *or the several writings must be so connected, either physically or otherwise, as to show by internal evidence that they relate to the same contract*. [Citation.]" (Emphasis added.) *Mid-Town Petroleum, Inc. v. Dine*, 72 Ill. App. 3d 296, 303-04 (1979).

Thus, a reference in the signed document to the unsigned document is not necessary for the two to comprise a single contract. Here, the Agreement denominates itself as part of the Proposal, and both documents identify the same contracting parties. This verbal connection between the two documents was confirmed with a physical connection: Wardeberg testified that the Agreement was attached to the Proposal when he submitted them to Schwan. This testimony was not contradicted by West Bend; Schwan had no recollection of receiving the Agreement but had no reason to doubt that he did. Consistent with this, Schwan gave no opinion on whether the Agreement was attached to the Proposal when he received them.

¶ 24 Moreover, Jason the Mason's conduct following its undisputed receipt of the Proposal and appended Agreement confirms that it considered itself bound by the Agreement. The Agreement required Jason the Mason to produce for Ridgeway a certificate of insurance designating Ridgeway as an additional insured under the Policy. On January 2, Ridgeway requested, and R-H provided, a certificate of insurance stating: "DJW RIDGEWAY BUILDING CONSULTANTS IS NAMED AS ADDITIONAL INSURED ON A PRIMARY NON-CONTRIBUTORY BASIS." " 'It is well settled that a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it.' " *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 64 (quoting *Landmark Properties, Inc. v. Architects International-*

*Chicago*, 172 Ill. App. 3d 379, 383 (1988)). Jason the Mason, in complying with the Agreement's mandate that it obtain a certificate of insurance confirming coverage for Ridgeway, manifested assent to the Agreement's terms.

¶ 25    West Bend claims, however, that there is "no evidence that Jason the Mason had any involvement in the issuance of the certificate." We are not sure what kind of "involvement" West Bend means. Jason the Mason's original "involvement," we may say, was its signing a written agreement with Ridgeway (consisting of the Proposal and the Agreement) requiring it to name Ridgeway as an additional insured and to produce a certificate of insurance to that effect. Jason the Mason might not have been the party to contact R.H. or physically fax the certificate, but it clearly directed Ridgeway to R-H.

¶ 26    West Bend also finds it important that Ridgeway requested the certificate "[p]er [its] insurance agent" and did not mention any contractual requirement that Jason the Mason produce the document. West Bend takes this as evidence that Ridgeway itself did not consider the Agreement effective. This is not persuasive. West Bend points to no reason apparent of record why Ridgeway would want the certificate other than because of the Agreement. A court "is not required to entertain unreasonable inferences raised in opposition to a motion for summary judgment." *Thede v. Kapsas*, 386 Ill. App. 3d 396, 401 (2008). Quite likely, the requirement that Ridgeway be named as an additional insured originated in a requirement of Ridgeway's own insurer, in which case the request for the certificate was, ultimately, "per [Ridgeway's] insurance agent."

¶ 27    After the briefs were filed in this case, West Bend directed our attention to *Athens Insurance Co.*, 2015 IL App (1st) 140006. West Bend claims that the case bolsters its position that Jason the Mason and Ridgeway never agreed for Ridgeway to be named as an additional

insured. We read the case quite differently. In *Athens*, the general contractor (Athens) claimed coverage under the West Bend insurance policy of its subcontractor, R. Carrozza Plumbing Company. The policy (like the Policy here) extended coverage to any party required by a written agreement to be named as an additional insured. Athens claimed that its subcontract agreement with Carrozza required the additional-insured designation. The only portion of the subcontract agreement that mentioned additional-insured parties was section 13.1, which stated:

> " 'The Subcontractor shall purchase and maintain insurance of the following types of coverage and limits of liability:

| Types of insurance | Limits of liability ($0.0) |
|---|---|
| The following clause should be | $1,000,000.00 |
| provided on the Subcontractor's | |
| Certificate of Insurance: | |

> *Athens Construction Co., Inc.*
>
> *Additional insured, on a primary and*
>
> *non-contributory basis*.' " (Emphasis in original.) *Id.* ¶ 6.

¶ 28 Carrozza arranged for a certificate of insurance that named Athens as an additional insured. The certificate contained, however, a disclaimer that it conferred no insurance rights apart from Carrozza's insurance policy. *Id.* ¶ 8.

¶ 29 The trial court granted summary judgment for Carrozza, finding no coverage for Athens under Carrozza's policy. The appellate court affirmed. The court disagreed with Athens over the import of section 13.1 and the certificate of insurance that Carrozza obtained for Athens:

> "We find that the subcontract did not require Athens to name Carrozza as an additional insured on Carrozza's [commercial general liability] policy. The plain

meaning of article 13.1 [of the subcontract agreement] is that Carrozza was required to state that Athens was an additional insured on a certificate of insurance. However, the certificate contained a disclaimer that it conferred no rights on Athens, the certificate holder, and did not alter coverage. Where the certificate refers to the policy and expressly disclaims any coverage other than that contained in the policy itself, the policy governs the extent and terms of the coverage. [Citation.] *** We *** find that the certificate of insurance does not serve as evidence of the parties' intent to name Athens as an additional insured, given that the actual, plain language of the subcontract does not contain such a requirement. [Citation.]

*** [T]here is a presumption against provisions that easily could have been included in a contract but were not. [Citation.] Athens could have required Carrozza to add it as an additional insured, but did not." *Id.* ¶¶ 28-29.

¶ 30 We held above that, though the Agreement was unsigned, Jason the Mason manifested its assent to the Agreement's additional-insured requirement by providing Ridgeway a certificate of additional-insured coverage as required by the Agreement. To the extent that the reasoning of *Athens* suggests that the issuance of the certificate was not itself evidence of assent to the Agreement's terms, we decline to follow it. *Kovac v. Barron*, 2014 IL App (2d) 121100, ¶ 85 ("[W]e are not bound to abide by the holding of another district of the appellate court."). Moreover, the facts at hand are distinguishable under *Athens*' own logic. The stumbling point for Athens, in the appellate court's view, was that the subcontract agreement, though it required a certificate of additional-insured coverage, did not require that Carrozza actually add Athens as an additional insured. Ridgeway does not have that difficulty here. Section 5 of the Agreement requires not only that Jason the Mason procure a certificate of insurance naming Ridgeway as an

additional insured, but also that Ridgeway actually be designated as an additional insured under the Policy.

¶ 31   For the foregoing reasons, we find that the undisputed facts demonstrate the existence of a "written contract or written agreement" requiring that Ridgeway be named as an additional insured under the Policy.

¶ 32                              C.  Primary or Excess Insurance

¶ 33   Next, West Bend contends that, even if Ridgeway were an additional insured under the Policy, West Bend would still have no duty to defend, because Ridgeway's additional-insured coverage would be excess, not primary.   We disagree.

¶ 34   Primary and excess coverages differ in the following manner:

"Primary insurance coverage is coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of an event that gives rise to liability. [Citation.]   A primary insurer provides 'first dollar' coverage up to the limits of its policy. [Citation.]   In contrast with primary insurance, excess insurance coverage is a secondary layer which protects an insured when a judgment or settlement exceeds the primary policy's limits of liability. [Citation.] A secondary insurer covers the same risks as the primary insurer [citation], but under the terms of an excess policy, the secondary insurer's liability attaches only after a predetermined amount of primary coverage has been exhausted.  [Citations.]  Put another way, an excess policy does not broaden the underlying coverage, it increases the amount of coverage available to compensate for a loss.  Excess insurance premiums are typically less expensive than primary insurance premiums because excess insurers experience less frequent claims and incur lower costs

than primary insurers. [Citations.]" (Internal quotation marks omitted.) *Certain Underwriters at Lloyd's*, 2014 IL App (1st) 133145, ¶ 2.

¶ 35 An excess or secondary insurer's duty to defend does not arise until the limits in the primary policy are reached. *Metzger v. Country Mutual Insurance Co.*, 2013 IL App (2d) 120133, ¶ 20. Ridgeway does not dispute that, if the coverage provided it as an additional insured is excess coverage, then West Bend has no duty to defend it in the underlying action.

¶ 36 Moreover, Ridgeway does not place any weight on the certificate of insurance issued by R-H, which stated that Ridgeway was covered as an additional insured "on a primary non-contributory basis." The certificate referenced the Policy and expressly provided that it was for informational purposes only and conferred no coverage rights on Ridgeway apart from the Policy. "Where the certificate refers to the policy and expressly disclaims any coverage other than that contained in the policy itself, the policy governs the extent and terms of the coverage." *Athens*, 2015 IL App (1st) 140006, ¶ 28. Ridgeway is correct, therefore, to forgo reliance on the certificate as evidence of the type of coverage afforded it.

¶ 37 We now turn to the Policy, which provides that the additional-insured coverage is "excess over: Any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis *unless a written contract specifically requires that this insurance be either primary or primary and noncontributing*." (Emphasis added.) The crucial word here, as the parties recognize, is "specifically," but it is not defined in the Policy. We resort to the dictionary to ascertain the plain and ordinary meaning of the term. *Munoz*, 237 Ill. 2d at 436. "Specifically" is defined as "with exactness and precision **:** in a definite manner." Webster's Third New International Dictionary 2187 (1993). We stress, however, that the "written contract" need not employ the precise terms "primary" and "noncontributing" so long as

the unmistakable import of the language used is that coverage will be primary and noncontributing.

¶ 38     Ridgeway points to exhibit A of the Agreement, which itemizes the coverage to be afforded an additional insured.   As Ridgeway notes, among the required coverage is (1) "commercial general liability insurance" with an individual occurrence limit of $1,000,000 and a general aggregate limit of $2,000,000; and (2) "umbrella liability insurance" of $1,000,000, "to be excess of:   employer's liability, *general liability insurance* [and] automobile liability insurance" (emphasis added).   Ridgeway submits that "[t]his language demonstrates that the first $2,000,000 of commercial general liability that Jason the Mason was contractually required to provide for [Ridgeway] as an additional insured was *primary* insurance, as opposed to excess or umbrella coverage."   (Emphasis in original.)   We agree.   The only coverage described as excess in exhibit A is the umbrella coverage.   This coverage is expressly designated as excess over the general liability insurance that exhibit A also require**s**.   A policy may, of course, be excess over other excess policies.   See 15 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 217:3 (1999).   Here, however, we apply the maxim *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another).   See *Suga v. Suga*, 35 Ill. App. 2d 355, 359 (1962) (applying the maxim in contract interpretation).   If Ridgeway and Jason the Mason intended for the general liability coverage to be excess, they would have so labeled it, as they did the umbrella coverage.   We conclude, therefore, that the general liability coverage is primary.

¶ 39     West Bend cites case law for the principle that "an insured cannot selectively tender a defense to his excess insurer while primary coverage remains unexhausted" (*River Village I, LLC v. Central Insurance Cos.*, 396 Ill. App. 3d 480, 490 (2008)).   Of course, this principle would bar Ridgeway's tender of its defense only if its additional-insured coverage were excess rather than

primary. West Bend, however, offers nothing substantial on the decisive issue of how to characterize that coverage. Rather than engage the language of exhibit A, West Bend repeatedly asserts, without supporting argument, that exhibit A does not "specifically" (per the Policy) require that the additional-insured coverage be primary. This assumes, however, that Ridgeway could not "specifically" require "primary" or "primary and noncontributing" coverage for an additional insured without using those very words. The plain, ordinary, and popular meaning of "specifically" is not so restrictive.

¶ 40    Because Ridgeway's additional-insured coverage under the Policy includes primary coverage as a portion of its total coverage, West Bend has a duty to defend Ridgeway in the underlying action.

¶ 41                                III. CONCLUSION

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 43    Affirmed.