2022 IL App (1st) 200808-U

THIRD DIVISION
August 3, 2022

No. 1-20-0808

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CAPITOL CONSTRUCTION SOLUTIONS, INC. and COUNTRY MUTUAL INSURANCE COMPANY, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) ) | Cook County |
| v. | ) ) | 15 CH 10486 |
| SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA, | ) ) ) ) | Honorable David B. Atkins, Judge Presiding |
| Defendant-Appellee. | ) | |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1 *Held*: Affirmed. Targeted tender rule did not allow insured to tender defense to insurer whose policy only required excess coverage. Insurer was not estopped from asserting coverage defenses.

¶ 2 After Capitol Construction Solutions, Inc. (Capitol) was sued for a workplace injury, it tendered its defense and any indemnification to a subcontractor's insurer, Selective Insurance Company of South Carolina (Selective). Selective refused the tender twice. Thus, under a reservation of rights, an insurer of another subcontractor, Country Mutual Insurance Company (Country Mutual) accepted defense on Capitol's behalf. Eventually, the underlying personal injury claim was settled.

¶ 3    Capitol and Country Mutual filed this declaratory judgment action to determine whether Selective had been obligated to accept Capitol's tender and, thus, be the "primary" insurer in the underlying case. The parties cross-moved for summary judgment. The Court entered summary judgment in Selective's favor, finding that under the policy, Capitol was only entitled to "excess" coverage, and denied summary judgment to Capitol and Country Mutual.

¶ 4    Capitol and Country Mutual appeal, arguing that the circuit court erred in finding that the Selective policy did not provide "primary" coverage. For the following reasons, we agree with the circuit court that the relevant contract language only obligated Selective to cover Capitol on an "excess" basis. We thus affirm.

¶ 5                              BACKGROUND

¶ 6    Capitol was the general contractor for a construction project in downtown Chicago. Capitol hired various subcontractors on the project, two of which were Tricor Carpentry LLC (Tricor) and P&M Mercury Mechanical Corporation (P&M). For its part, Tricor obtained insurance from Country Mutual, which named Capitol as an additional insured on its policy.

¶ 7    As to P&M, its subcontracting agreement provided, in relevant part:

"[P&M] shall purchase and maintain Insurance of the following types of coverage and limits of liability as will protect the Subcontractor from claims that may arise out of, or result from, the Subcontractor's operations and completed operations under the Subcontract:

| Type of insurance | Limit of liability |
| --- | --- |
| General Liability | $1,000,000/$2,000,000 |
| Workers Compensation | $1,000,000 or as required by State Law |

*********CAPITOL CONSTRUCTION SERVICES, INC MUST BE LISTED AS AN ADDITIONAL INSURED**********"

¶ 8    As required by the subcontracting agreement, P&M procured a general liability insurance policy from Selective. This Selective Policy provides P&M with primary insurance in the amounts required by the subcontract with Capitol. Additionally, the policy contains an Additional Insured Endorsement. This endorsement states:

"**SECTION** II - **WHO IS AN INSURED** is amended to include as an additional insured any person or organization whom you have agreed in a written contract or written agreement to add as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for 'bodily injury' or 'property damage' caused, in whole or in part, by 'your work' performed for that additional insured and included in the 'products-completed operations hazard'."

It continues:

"With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

* * *

*This coverage shall be excess* with respect to the person or organization included as an additional insured by its provisions; any other valid and collectible insurance that person or organization has shall be primary with respect to this insurance, *unless this coverage is required to be primary* and/or not contributory in the contract or agreement referred to above." (Emphasis added.)

¶ 9    The Certificate of Insurance shows that P&M also obtained a separate Excess/Umbrella Policy from Selective. This Certificate states it "is issued as a matter of information only and confers no rights upon the certificate holder, this certificate does not amend, extend or alter the coverage afforded by the policies below." It also states "Capitol Construction Solutions, Inc. [is

an] Additional Insured[] for General Liability and Auto Liability if required by written contract. Umbrella policy follows form with respect to coverage afforded to the Additional Insureds."

¶ 10    Sometime after work began on the project, Mitchell Noworul, a sheet metal foreman for P&M, was injured on the construction site. To recover for the injury, he filed a complaint against Capitol, P&M, Tricor, and an LLC involved in the project (Noworul lawsuit).

¶ 11    Capitol, under the "targeted tender" doctrine, tendered defense and indemnification of the Noworul lawsuit to Selective on a primary and noncontributing basis. Selective did not initially respond, and Capitol made a second tender two months later. Two months after the second tender, Selective refused the tender. Selective acknowledged that Capitol was an additional insured but claimed the policy only provided Capitol with excess coverage.

¶ 12    After Selective refused the tender, County Mutual agreed to accept defense of the Noworul lawsuit. The Noworul lawsuit continued for nearly 4 years before it was settled for $1.5 million. Of this settlement, County Mutual contributed $1 million and Westfield Insurance Company (Capitol's insurance provider) covered the remaining $500,000. Because each of those primary carriers had policy limits of $1 million, and the $1.5 million settlement did not exceed those combined limits, Selective refused to contribute to the settlement as an excess carrier.

¶ 13    Approximately 6 months before the Noworul lawsuit was finally settled, Capitol and County Mutual filed this case, seeking a declaration that Selective had breached its duty to defend and indemnify Capitol. They sought an order requiring Selective to indemnify County Mutual for the cost of defense and settlement funds for the Noworul lawsuit. Selective moved for summary judgment. At Plaintiffs' request, the court allowed the parties to engage in discovery before ruling on the pending motion. After discovery, Selective filed an amended motion for summary judgment. Plaintiffs responded and filed their cross-motion.

¶ 14    The circuit court entered a written memorandum order entering summary judgment in favor of Selective and against plaintiffs. The court disagreed with plaintiffs' claim that Selective was estopped from raising coverage defenses. The court then interpreted the Selective policy as only requiring excess coverage under its policy:

> "The only way, pursuant to the Selective Policy, that Capitol may initially trigger that coverage is if the Subcontract requires that the coverage be primary in nature. Just as the Certificate reflects, the Subcontract requires that Capitol be listed as an 'additional insured,' and makes no mention that such additional insured coverages must be primary. Because the Subcontract does not require that the coverage be primary, the condition precedent required by the Selective Policy has not been met."

¶ 15    Capitol and Country Mutual timely appealed.

¶ 16                                    ANALYSIS

¶ 17    The interpretation of an insurance policy is a legal question we review *de novo*, performing the same role as the trial court and giving no deference to the trial court's interpretation. *Certain Underwriters at Lloyd's, London v. Central Mutual Insurance Co.*, 2014 IL App (1st) 133145, ¶ 7. We likewise review a grant of summary judgment *de novo*. *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007). Summary judgment is appropriate if there is no genuine issue of material fact, and the movant is entitled to a judgment as a matter of law. See *Central Mutual,* 2014 IL App (1st) 133145, ¶ 7.

¶ 18    Plaintiffs claim the circuit court erred in construing the Selective policy as providing for "excess" coverage only. They argue that the trial court's construction ignores Illinois's "targeted tender" rule and the parties' intent from the construction contract.

¶ 19    We begin by noting the difference between "primary" coverage policies and "excess" coverage policies. With primary coverage, the insurer's liability to its insured attaches at the moment an event occurs that would trigger coverage under the policy. *Central Mutual,* 2014 IL App (1st) 133145, ¶ 2. Excess policies provide a secondary level of coverage if the insured's liability exceeds the limits of its existing primary coverage. *Kajima*, 227 Ill. 2d at 114. So if the insured has primary coverage of $100,000 and excess coverage of $100,000, and the insured's liability is $125,000, the insured will first exhaust the primary coverage limits of $100,000, and the excess coverage will provide the additional $25,000 that exceeded the limits of the primary coverage. Excess policies generally do not come into play unless and until the primary coverage limits are exhausted.

¶ 20    If an insured has more than one primary insurance carrier, Illinois law grants that insured the right to "tender defense of an action to one insurer alone." *John Burns Construction Co. v. Indiana Insurance Co.*, 189 Ill. 2d 570, 578 (2000). Known as the doctrine of "targeted tender," this rule allows an insured covered by multiple and concurrent primary insurance policies to choose—or "target"—one of those carriers to defend and indemnify the insured against a claim. See *Kajima*, 227 Ill. 2d at 107; *Central Mutual,* 2014 IL App (1st) 133145, ¶ 9. An insured may have various reasons for selecting one primary coverage over the other, including minimizing future premiums, optimizing loss history, or preventing a particular insurer from cancelling its policy. *Central Mutual,* 2014 IL App (1st) 133145, ¶ 9.

¶ 21    But as noted, the "targeted tender" doctrine only applies if an insured has more than one policy of *primary* coverage. This doctrine has thus spawned attempts by primary insurers to avoid this doctrine by including "other insurance" provisions in their policies. See *id*.; *River Valley I, LLC v. Central Insurance Companies*, 396 Ill. App. 3d 480, 487 (2009); *Putnam v. New*

*Amsterdam Casualty Co.*, 48 Ill. 2d 71, 76 (1970) (discussing types of "other insurance" provisions).

¶ 22    "Other insurance" provisions attempt to render a policy that otherwise would be considered "primary" as "excess," usually with statements declaring the insured's coverage to be excess over any other valid and collectible insurance the insured has obtained. *Central Mutual,* 2014 IL App (1st) 133145, ¶ 9; *River Valley*, 396 Ill. App. 3d at 486-87. Relying on that provision, Insurer A will claim that its insured is required to first exhaust the policy limits of any other co-insurers (say, Insurers B and C) before turning to Insurer A's coverage, if needed. See *Central Mutual,* 2014 IL App (1st) 133145, ¶ 9; *River Valley*, 396 Ill. App. 3d at 486-87.

¶ 23    The result is that some policies will be written as excess coverage only, while others may be primary but *become* excess by virtue of that policy's "other insurance" provision. *Kajima*, 227 Ill. 2d 102 at 115.

¶ 24    This distinction matters, because our supreme court has made clear that, as between two *primary* insurance carriers, an "other insurance" provision cannot nullify the "targeted tender" rule. See *John Burns*, 189 Ill. 2d at 578; see also *River Valley*, 396 Ill. App. 3d at 487. The reason is that "the purpose of an 'other insurance' clause is not to trigger coverage but to provide a method of apportioning coverage that would be triggered otherwise." *John Burns*, 189 Ill. 2d at 576. So while it may helpful to apportion liability among various primary insurers, an "other insurance" provision will not prevent an insured from target-tendering coverage to one of those primary insurers over the others.

¶ 25    But the same is not true of policies that are written as excess policies. If a policy is written as excess—not because of the application of an "other insurance" provision, but because it is literally written as excess—the "targeted tender" rule is inapplicable; an excess insurer

cannot be targeted for primary coverage and need not provide coverage unless and until all primary coverage is exhausted. *Kajima*, 227 Ill. 2d at 116-17; *River Village*, 396 Ill. App. 3d at 492. As our supreme court explained:

> "targeted tender can be applied to circumstances where concurrent primary insurance coverage exists for additional insureds, but to the extent that defense and indemnity costs exceed the primary limits of the targeted insurer, the deselected insurer or insurers' primary policy must answer for the loss before the insured can seek coverage under an excess policy. This holding preserves the distinction between primary and excess insurance policies." *Id*. at 117.

¶ 26    For example, in *Kajima*, 227 Ill. 2d at 104, the general contractor, Kajima, subcontracted with a company on a construction project and required, in its subcontract, that the subcontractor take out a policy of primary and excess liability insurance. The subcontractor took out a policy with St. Paul for primary liability coverage of $2 million and "umbrella" excess liability coverage of $5 million and named Kajima as an additional insured. *Id*. Kajima and the subcontractor were later named as defendants in a lawsuit stemming from a personal injury on the worksite. *Id*. Kajima tendered defense and indemnification to the subcontractor's insurer, St. Paul. *Id*. The personal-injury lawsuit ultimately settled for $3 million. *Id*.

¶ 27    Both Kajima and its own primary insurer sued St. Paul for declaratory relief, claiming that St. Paul had to pay all $3 million, the first two million from its primary coverage and the last million from its excess coverage. The "targeted tender" rule, they claimed, gave Kajima the right to choose St. Paul's coverage over its own coverage. St. Paul, on the other hand, said that its excess coverage could not be triggered until *all* primary insurance had been exhausted—not just

St. Paul's $2 million in primary coverage but also Kajima's primary insurance coverage. *Id*. at 104-05.

¶ 28 Our supreme court agreed with St. Paul. First, the court had to determine whether St. Paul was correct that its policy was written as an excess policy—sometimes called a "true" excess policy—as opposed to being excess only by virtue of an "other insurance" provision. There, it was undeniably clear that St. Paul's excess policy was excess only. The policy described its coverage as " 'Umbrella Excess Liability Protection Coverage' " and provided that it covered its insured's liability damages to the extent they exceeded the primary insurer's coverage. *Id*. at 116.

¶ 29 Once the supreme court determined that the St. Paul excess policy was literally written as an excess policy, it held that the "targeted tender" doctrine did not require St. Paul to provide excess coverage unless and until all primary coverage was first exhausted. *Id*. at 116-17. To hold otherwise, the court reasoned, would require an insurer that charged premiums for purely excess coverage only to suddenly become a primary insurer at the whim of an additional insured. *Id*.

¶ 30 The long and short is this: The "targeted tender" rule permits an insured to tender coverage to any of its primary insurers, even those with "other insurance" provisions, but it does not allow an insured to force an excess carrier to accept a tender of primary coverage. *Id*. at 116-17; *River Village*, 396 Ill. App. 3d at 492.

¶ 31 That lays the framework for the question before us. As a reminder, Capitol was the general contractor on the project and hired P&M as a subcontractor. The subcontract required P&M to purchase insurance and to cover Capitol as an additional insured. P&M did so via a policy with Selective. After the worksite accident that spawned the need for coverage, Capitol turned not to its own insurer (Westfield Insurance) nor to the other subcontractor's carrier (County Mutual) but to Selective, P&M's insurer. Selective, however, refused the tender,

claiming that its coverage, insofar as it pertained to Capitol, was only an excess policy to which the "targeted tender" doctrine did not apply.

¶ 32    If Selective is correct that its coverage of Capitol was excess coverage only, then it is also correct that the "targeted tender" doctrine does not apply. So the question simply comes down to whether its coverage was an excess policy only.

¶ 33    As with any contract, "[w]hen construing insurance contracts, our goal is to ascertain and give effect to the contracting parties' intentions as expressed in the agreement or agreements they signed." *Central Mutual*, 2014 IL App (1st) 133145, ¶ 8. "If the words used in an insurance contract, when given their plain and ordinary meaning, are unambiguous, then we apply the terms of the policy as written." *Id*.

¶ 34    As we will discuss below, the Selective policy language at issue here falls somewhere between *Kajima*, on the one hand, and *John Burns*, on the other. The St. Paul policy in *Kajima*, 227 Ill. 2d at 116, was clearly an excess policy only—not because of an "other insurance" provision but because on its face, without question (and as far as we can tell, without dispute by the parties), the policy described itself as an umbrella excess insurance policy that covered only what primary coverage did not—the very definition of excess coverage. On the other end of the spectrum, the policy in *John Burns*, 189 Ill. 2d at 574, contained an "other insurance" provision that converted a policy that was otherwise primary into excess coverage if other primary insurance existed.

¶ 35    The language here in the Selective policy is not nearly so simple as the St. Paul policy in *Kajima*. Nor are we concerned here with "other insurance" language *per se*. There is, to be sure, "other insurance" language in the Selective policy, but that is not the language on which Selective relies. Instead, as shown below, Selective relies on language from its policy that

references a different document—the subcontract between Capitol and Selective's insured, P&M:

> "This coverage shall be *excess* with respect to the person or organization included as an additional insured by its provisions; any other valid and collectible insurance that person or organization has shall be primary with respect to this insurance, *unless this coverage is required to be primary and/or not contributory in the contract or agreement referred to above.*" (Emphasis added.)

¶ 36 This language, in a nutshell, provides that the Selective policy provides only excess coverage to the additional insured, Capitol, "unless" the subcontract between Capitol and P&M "required" P&M to provide primary coverage to Capitol. This provision does not convert otherwise primary coverage into excess simply by virtue of the existence of other insurance. The existence of other insurance is not what triggers whether Selective's policy is primary or excess. The triggering question is whether the Capitol/P&M subcontract "required" P&M to cover Capitol with primary insurance. If it did, then Selective would provide primary coverage to Capitol. If not, Selective's coverage of Capitol was excess coverage only.

¶ 37 Thus, to decide whether Selective's coverage of Capitol, the additional insured, was primary or excess, we must resort to the language of the subcontract between Capitol and P&M. The operative language of the subcontract, found in paragraph 13, is as follows:

> "13. The Subcontractor [P&M] shall purchase and maintain insurance of the following types of coverage and limits of liability as will protect the Subcontractor from the claims that may arise out of, or result from, the Subcontractor's operations and completed operations under the Subcontract:

| Type of insurance | Limit of liability |
|---|---|
| General Liability | $1,000,000/$2,000,000 |
| Workers Compensation | $1,000,000 or as required by State Law |

*********CAPITOL CONSTRUCTION SERVICES, INC MUST BE LISTED AS AN ADDITIONAL INSURED**********"

¶ 38   The parties agree on this much: This provision required P&M to purchase and maintain "general liability" insurance, to the tune of $1 million per occurrence, $2 million total, to protect P&M from claims arising out of work on the project. And of course, the language immediately below that provision required that Capitol be "listed as an additional insured" without further elaboration.

¶ 39   Selective, defending the judgment on appeal, claims that this language does not "require" P&M to insure its additional insured, Capitol, with primary coverage. Selective notes first that the word "primary" never appears in paragraph 13.  And second, even if "general liability" insurance meant primary coverage insofar as what P&M was required to purchase for *itself*, the "additional insured" language did not require P&M to name Capitol on that *particular* coverage; P&M could have added excess coverage to that policy and named Capitol only on that secondary level of coverage. Thus, the subcontract did not "require" that Capitol be provided primary coverage.

¶ 40   Capitol, on the other hand, claims that this language demonstrates that P&M was required to insure Capitol for primary coverage. Its reasoning is this: (1) the phrase "general liability" could only be referring in this context to primary coverage, not excess; and (2) by requiring that Capitol be listed as an additional insured in the sentence that immediately follows the demand for primary insurance, logic dictates that Capitol was supposed to be named as an additional insured on that same primary coverage. Capitol further points to another provision in the

subcontract, paragraph 12, a hold-harmless provision requiring P&M to "indemnify and hold harmless" Capitol from "claims, damages, losses and expenses" resulting from performance of the construction project.

¶ 41    One problem with this argument at the outset, as Selective notes, is that the phrase "general liability" insurance refers not to whether the coverage is primary or secondary, but rather to the *types of risk* covered. CGL coverage differs in the risks it covers compared to, say, worker's compensation insurance, automobile insurance, malpractice insurance, or errors-and-omissions coverage. (Look no further than the subcontract at issue here, which required P&M to purchase both CGL and worker's compensation insurance.) As one noted treatise summarized, "The general liability insurance policy protects business owners against liability to third parties." New Appleman on Insurance Law Library Edition, § 16.02[3][a], at 16-28. CGL coverage has been held to cover, for example, an insured from liability for alleged violations of the Telephone Consumer Protection Act for sending out "junk" faxes to unwilling recipients. See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 379 (2006).

¶ 42    The recent decision of *O'Brien's Response Management, L.L.C. v. BP Exploration & Production, Inc.*, 24 F.4th 422 (5th Cir. 2022), is helpful here. The Fifth Circuit construed an oil-cleanup contract between an oil company—BP—and its contractor—O'Brien's—that required O'Brien's to maintain "comprehensive general liability insurance" and to include BP as an additional insured. *Id*. at 428-29. After lawsuits were filed over personal injuries on the worksite, BP tendered coverage to an umbrella insurer for O'Brien's, Navigators. But Navigators claimed that it was not required to cover BP as an additional insured, because the additional-insured language only required O'Brien's to cover BP for *primary* CGL coverage, not umbrella coverage. The Fifth Circuit rejected that argument, noting that "the word 'primary' is nowhere in

the text of the Contract, which requires only that O'Brien's 'maintain' CGL insurance with a certain minimum limit." *Id.* at 430. In a footnote, the court elaborated, recognizing that in some instances, it will be obvious that "CGL" insurance refers to primary insurance:

> "To be sure, some contracts include separate provisions requiring CGL insurance and also excess coverage. [Citation.] None of the cases cited by Navigators, however, concludes that excess coverage mirroring a primary CGL policy does not constitute CGL coverage. And we see no need to draw that conclusion today." *Id.* n.9.

¶ 43     We likewise do not see why a reference in the Capitol-P&M subcontract to "general liability" coverage should automatically mean that the additional insured, Capitol, would be entitled to *primary* general liability coverage.

¶ 44     Illinois case law provides additional guidance. This is not, after all, the first time a construction contractor or subcontractor has entered into a contract that included a requirement that insurance be purchased for an additional insured (usually the property owner or general contractor). Nor is this the first time that the insurance policy purchased provided that the coverage for the additional insured be excess, unless the construction contract "required" primary coverage for the additional insured.

¶ 45     In *River Village*, 396 Ill. App. 3d at 480, the general contractor, River Village, entered into a building contract with First Choice. The contract required First Choice to take out insurance and cover River Village as an additional insured. *Id.* The contract did not specify whether the insurance policy must be primary or excess, only that First Choice was required to indemnify and hold River Village harmless for any and all claims arising from the work. *Id.*

¶ 46     First Choice purchased this insurance from Central Insurance. The Central policy stated that its coverage of an additional insured like River Village was excess over any other valid and

collectible insurance "unless a contract specifically requires that this insurance be either primary or primary and noncontributing." *Id.* at 490. When River Village was sued over an accident on the worksite, River Village tendered coverage to Central as the primary insurer. Central denied that it was a primary insurer, claiming that First Choice's contract with River Village did *not* "specifically require" that First Choice purchase *primary* insurance coverage for River Village— only that it purchase insurance.

¶ 47  We agreed with Central. We found the language in the Central policy "clear and unambiguous," providing that Central's coverage of additional insureds like River Village was excess only, absent a specific requirement in the contract between River Village and First Choice that the coverage purchased for River Village be primary. *Id.* at 490-91. We then reviewed the River Village-First Choice contract and noted that it was "completely silent regarding the type of insurance (primary or excess) First Choice was to obtain for River Village." *Id.* at 491 (parenthetical in original). Because that contract did not "specifically require" that First Choice purchase insurance for River Village that was primary, Central owed no duty to River Village, its additional insured, to provide primary coverage. *Id.*

¶ 48  We followed *River Village* in *Central Mutual*, 2014 IL App (1st) 133145. There, the general contractor, Builders, contracted with a subcontractor, Erik Electric, for work on a home construction site. The contract required Erik Electric to purchase general liability insurance in a specified amount and to name Builders as an additional insured on that policy, but the subcontract did not specify that the coverage of the additional insured had to be primary coverage. *Id.* ¶ 1. Erik Electric then purchased the insurance from CMIC; the policy stated that CMIC's coverage of an additional insured would be excess "unless a contract specifically requires that this insurance be either primary or primary and noncontributing." *Id.* ¶ 11.

¶ 49　After a lawsuit was filed over a worksite injury, Builders tendered coverage to CMIC as the primary insurer. CMIC denied coverage, stating that its coverage of the additional insured, Builders, was excess only, because the subcontract between Builders and Erik Electric did not "specifically require" that Erik Electric purchase *primary* insurance coverage for Builders. We agreed, as in *River Village*, noting that the "[t]he subcontractor agreement between Builders and Erik Electric is undisputedly silent as to whether the coverage provided to Builders as an additional insured will be primary or excess insurance." *Id.* ¶ 12. As there was no provision in the subcontract specifically requiring CMIC to provide primary coverage to Builders, CMIC's coverage was excess. *Id.*

¶ 50　We see no daylight between those two decisions and this case. True, in each of those decisions, the insurance policy said it would provide primary coverage to an additional insured only if the construction contract "specifically required" primary coverage for the additional insured, whereas here, the Selective policy used the word "required" without the word "specifically." But we see no real difference for our purposes. Perhaps the word "specifically" adds a more literal requirement, but in practice, we think it is fair to say: either the subcontract required primary coverage for the additional insured, or it did not. Here, as in *River Village* and *Central Mutual*, the subcontract between Capitol and P&M did not.

¶ 51　Capitol urges us to follow the decision in *DJW-Ridgeway*, 2015 IL App (2d) 140441, containing roughly analogous facts and contractual language—including an insurance policy providing that coverage of the additional insured was excess unless the insured's contract with the additional insured "specifically required" that the additional insured's coverage be primary— but resulting in a different outcome. That decision, however, contains one materially different fact that makes it distinguishable.

¶ 52    There, the general contractor on a commercial construction job, Ridgeway, sub-contracted with Jason the Mason for masonry work. *Id.* ¶ 4. The subcontract required that Jason the Mason purchase "general liability" insurance, among other insurance, and that Ridgeway "be named as an additional insured on [Jason the Mason's] insurance policy(s)." *Id.* ¶ 11.

¶ 53    Unlike *River Village*, *Central Mutual*, and our case, however, the subcontract contained an exhibit A that listed all the insurance that Jason the Mason was required to purchase. *Id.* ¶ 12. The list included, along with the required amounts of coverage, the following: "I. Worker's Compensation Insurance;" "II. Commercial General Liability Insurance" in the amount of $1 million per occurrence; "III. Business Automobile Insurance;" and "IV. Umbrella Liability Coverage," described as "coverage to be excess of $1,000,000" to the other required insurance, including "General Liability Insurance." *Id.*

¶ 54    Jason the Mason purchased the required insurance from West Bend, with the policy providing that its coverage of any additional insured would be excess "unless a written contract specifically requires that this insurance be either primary or primary and noncontributing." *Id.* After a worksite injury led to a lawsuit, Ridgeway tendered the defense to West Bend, claiming that it owed a duty to provide primary coverage to Ridgeway as an additional insured.

¶ 55    West Bend denied coverage, claiming that Ridgeway's subcontract with Jason the Mason did not "specifically require" that Jason the Mason provide Ridgeway, the additional insured, with *primary* insurance coverage. This court disagreed, however, because the exhibit A attached to the subcontract specifically listed two kinds of "general liability" insurance that Jason the Mason was required to purchase: one policy in the amount of $1,000,000 per occurrence, and another—the "umbrella" policy—that was in "*excess* of $1,000,000" for "general liability" insurance. *Id.* ¶ 38. This court noted that "[t]he only coverage described as excess in exhibit A is

the umbrella coverage. This coverage is expressly designated as excess over the general liability insurance that exhibit A also requires." *Id.*

¶ 56    In other words, though the subcontract's exhibit did not specifically describe the first "general liability" insurance policy as primary, it specifically designated the *other* policy, the umbrella policy, as *excess* to the first policy. It was thus patently clear that the first general liability policy was intended to be primary coverage. *Id.* ("If Ridgeway and Jason the Mason intended for the general liability coverage to be excess, they would have so labeled it, as they did the umbrella coverage. We conclude, therefore, that the general liability coverage is primary.").

¶ 57    We do not find this decision to be inconsistent with *River Village* or *Central Mutual*. Nor do we think it governs the outcome of this case. Given the exhibit to the subcontract in *DJW-Ridgeway*, which specifically listed the second "general liability" policy as excess, there could be but what one conclusion about the first policy—it was primary.

¶ 58    Indeed, recall our earlier citation to the Fifth Circuit decision of *O'Brien's Response Management*, 24 F.4th at 430, where the court held that the contract's requirement that O'Brien's provide commercial general liability coverage to BP as an additional insured did not automatically mean that this CGL coverage had to be primary. But in a footnote, the court recognized that there might be instances where it was obvious that primary coverage was intended, such as when "contracts include separate provisions requiring CGL insurance and also excess coverage." *Id*. n.9.  That precisely describes *DJW-Ridgeway*: the subcontract contained separate requirements for general liability insurance coverage and excess coverage, leading to only one conclusion—that the first policy provided primary coverage.

¶ 59    Here, however, as in *River Village* and *Central Mutual*, there is no explicit mention of a second insurance policy and no mention of either the word "primary" or "excess." So we find

*DJW-Ridgeway* readily distinguishable and adhere to our holdings in *River Village* and *Central Mutual*.

¶ 60     In sum, the Capitol-P&M subcontract did not require that the general liability coverage include Capitol as an additional insured for *primary* coverage. Thus, the operative language in the Selective policy with P&M—that the subcontract "require" P&M to purchase primary additional-insured coverage for Capitol—was not triggered. Selective's coverage of Capitol was excess only, and thus the "targeted tender" doctrine is inapplicable. Selective properly refused to accept the tender from Capitol for primary coverage.

¶ 61     Finally, we need only briefly discuss Capitol's claim that Selective is estopped from asserting its contract defenses. Estoppel only applies in this context when an insurer fails to act, "sit[ting] on the sidelines," and is " '*later found to have wrongfully denied coverage*." (Emphasis in original.) *Central Mutual*, 2014 IL App (1st) 133145, ¶ 20 (quoting *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150-51 (1999)). The estoppel doctrine is "not relevant here," as we have just determined that Selective properly denied coverage. *Id.* ¶ 21.

¶ 62                                    CONCLUSION

¶ 63     For these reasons, the court properly entered summary judgment in favor of Selective. We affirm that judgment.

¶ 64     Affirmed.